```
 1                    UNITED STATES DISTRICT COURT
                     WESTERN DISTRICT OF WASHINGTON
 2

 3    CELL THERAPEUTICS,                    )
                                           )
 4                           Plaintiff, )  No. C 07-310
                                           )
 5                    v.                    )  Seattle, Washington
                                           )
 6    THE LASH GROUP,                       )
                                           )
 7                           Defendant. )
                                           )
 8

 9        BEFORE THE HONORABLE JAMES L. ROBART, DISTRICT JUDGE

10              REPORTER'S TRANSCRIPT OF PROCEEDINGS

11                         MAY 23, 2008

12

13

14    APPEARANCES:

15    For the Plaintiff:        DAN DUNNE
                                BRENDAN MANGAN
16

17    For the Defendant:        LAURIE THORNTON
                                TOM SUDDATH
18                              ELIZABETH FENTON

19

20

21

22    Court Reporter:           Laurene Kelly, RDR, CRR
                                700 Stewart Ave. #17207
23                              Seattle, WA  98101
                                206.370.8506
24                              Laurene_Kelly@wawd.uscourts.gov

25    Proceedings recorded by mechanical stenography, transcript
      produced by computer-aided transcription.
```

```
1    SEATTLE, WASHINGTON                    FRIDAY, MAY 23, 2008
2    HON. JAMES L. ROBART, DISTRICT JUDGE            9:04 A.M.
3                        PROCEEDINGS:
4            THE CLERK:  Case C 07-310, Cell Therapeutics versus
5    The Lash Group.
6            Counsel, please make your appearance.
7            MR. DUNNE:  Your Honor, for the plaintiff I'm Dan
8    Dunne from Heller Ehrman.  And I'm here with my partner Brendan
9    Mangan and Don Wyatt, who is counsel in-house for Cell
10   Therapeutics.
11           MISS THORNTON:  Good morning, Your Honor.  I'm Laurie
12   Thornton from Corr Cronin Michelson Baumgardner and Preece
13   representing The Lash Group.
14           Joining me at counsel table is Tom Suddath of
15   ReedSmith and Elizabeth Fenton, also for defendants.  They have
16   both been admitted pro hac vice.
17           And Mr. Suddath will be handling the argument.
18           THE COURT:  Counsel, we're here for argument on what
19   is in the docket as docket number 26, Lash's motion for
20   judgment on the pleadings; and I'm going to give you 20 or 25
21   minutes or so per side to argue this.  I may well interrupt you
22   as we go along to ask some questions.
23           Let me tell you a little bit about how I view this
24   case so that you can shape part of your argument.  We are here
25   on the motion to dismiss, and to me the wellspring of all law
```

1    in the Ninth Circuit on this issue is -- comes out of the

2    Mortgages case.  I'm somewhat amazed at the brevity of

3    Mortgages, but that was the decision that we have to work with.

4    There is substantial additional authority that has flowed forth

5    from Mortgages, which seems to me to be dispositive of certain

6    of the arguments that have been made, some by both sides in

7    this matter.

8          I note that there is a declarative, flat,

9    black-letter statement in Mortgages at one point that says

10   where one or more persons have committed a fraud upon the

11   government in violation of the F C A, each is jointly and

12   severally liable for treble damages and statutory penalty, and

13   that is indeed the case.  They then go on to discuss the

14   question of indemnification or contribution.

15         It seems to me that the question that I'm being asked

16   is is there a ban on indemnification or contribution, and I

17   think that's a question that you all need to address with some

18   care here.  And you might want to spend some time taking the

19   claims which are found in the complaint and either convincing

20   me that those arise out of the underlying conduct or they are

21   independent.

22         I will tell you, largely because of my own

23   background, I have some familiarity with the P S L R A, which

24   has analogous, not identical but analogous, ban on

25   indemnification and contribution claims against a settling

1    party, and I'm aware of the two lines of authority that arose

2    out of that and how we look at those claims in order to

3    determine if they are covered or not.

4              It seems to me that under different terms there has

5    been the importation or maybe exportation of some of those same

6    standards into this area.

7              So that's what I have been looking at in terms of

8    trying to understand this case, and I'll hear from Lash first;

9    and you may reserve some of your time.

10             MR. SUDDATH:  Thank you, Your Honor.

11             Good morning, Your Honor.  My name is -- as

12   Miss Thornton said, I'm Tom Suddath.  I'm from ReedSmith, and

13   we represent The Lash Group in this case.

14             Your Honor, the -- in our papers we have -- our

15   motion for judgment on the pleadings is based upon the fact

16   that each of the claims in the complaint, as pled, would have

17   the effect of giving C T I indemnification under the False

18   Claims Act, and under the Mortgages case and its -- the cases

19   that follow it from other jurisdictions any claim which has the

20   effect of giving indemnification to another party for liability

21   on the False Claims Act is a claim for indemnification and

22   therefore cannot be allowed to proceed.

23             The -- as alleged in the complaint, Your Honor, C T I

24   is a drug company which --

25             THE COURT:  Why don't you -- I think I understand.

1          MR. SUDDATH:  Okay.  Very good.  Then I'll go right

2    into the argument, Your Honor.

3          The -- their claim is that it seeks to recover 10.5

4    million dollars which it paid to the government to settle False

5    Claims Act allegations against it, and it claims that the -- it

6    paid these damages because it relied upon advice provided to it

7    by documents.  Under the Ninth Circuit decision in Mortgages,

8    all these claims must be dismissed because they have the effect

9    of -- if prevailed upon, to have Documedics repay through

10   indemnification the damages which it paid to the government.

11         THE COURT:  Has anyone outside the Ninth Circuit

12   followed Mortgages?  You mentioned a moment ago the other

13   courts that have followed Mortgages.  Seems to me there are

14   other courts that have construed the statute.  Has anyone

15   expressly adopted the Mortgages language?

16         MR. SUDDATH:  Your Honor, they have.  There have been

17   a number of the cases we cited in the -- in our papers.  One

18   case comes to mind is the -- as it goes to the issue of

19   independent claim which the Court raised, is the Prabhu case

20   out of the District of Nevada.  We also have the Miller case

21   out of the District of the District of Columbia, which

22   addressed the issue of recovery for alleged independent claims

23   under the False Claims Act, and both of them --

24         THE COURT:  The Nevada case, they didn't have a

25   choice.  You're telling me that there's a D.C. circuit

1    authority for this.

2            MR. SUDDATH:  No.  The District Court of the District

3    of Columbia.

4            THE COURT:  Okay.

5            MR. SUDDATH:  The cases which have addressed

6    Mortgages, we had the Madden case out of the Ninth Circuit

7    also, which again addressed the issue of whether or not the

8    claims under the False Claims Act -- if the nature of the claim

9    would have the effect of providing indemnification, and those

10   claims are not allowed to proceed under the False Claims Act.

11           THE COURT:  Is there a better term than independent

12   claim to describe the test that you're proposing?

13           MR. SUDDATH:  The -- I think that the issue would be

14   whether or not the ability to recover or the damages that are

15   sought are dependent -- are damages that are caused by or

16   dependent upon the defendant's -- in this case The Lash

17   Group's -- whether the damages that are allegedly caused by The

18   Lash Group's actions are inextricably tied to the damages that

19   the -- in this case C T I claims that it had paid.

20           And what I mean by that, Your Honor, is that in this

21   case the -- all the claims that C T I asserts are all dependent

22   upon the damages caused by the actions of The Lash Group.  But

23   for the advice given by The Lash Group, according to the

24   allegations in the complaint, C T I would not have been

25   damaged.

1          What they argue is that, because we caused them to

2     violate the False Claims Act, they have been damaged.  We in

3     effect, according to their allegations, participated in the

4     fraud, and as a result of their reliance upon our advice

5     they -- as pled, they were required to pay a 10.5

6     million-dollar -- 10.5 million dollars to the U.S. Attorney's

7     Office to settle these claims.

8          THE COURT:  Let's assume for a moment that they -- in

9     an independent action, so let's set aside any of those

10    procedural questions that are discussed sometimes -- and they

11    say, because of this entire episode our reputation has been

12    damaged to the tune of 25 million dollars, we can demonstrate

13    to you that we have suffered, and we have an expert who will

14    prove that, whatever.  Would you then say that that is an

15    indemnity or contribution claim?

16         MR. SUDDATH:  I would say that it is not -- it is a

17    claim that is not independent of their claim for

18    indemnification under the False Claims Act because that claim

19    of loss of reputation, if you will, is -- is a claim that

20    arises out of the actions of The Lash Group which caused them

21    to face liability under the False Claims Act, and as a result

22    of that everything is tied together.  You can't divorce the

23    loss of reputation, if you will, from the fact that they were

24    exposed to liability under the False Claims Act.

25         The cases which have addressed this that have allowed

1    the claims for independent counterclaims to go forward have

2    been the types of claims where there's been an allegation

3    against the qui tam relator that they have libeled or that

4    there had been malicious prosecution or that there had been a

5    misappropriation of trade secrets.  Those claims, those damages

6    are independent of any liability that the -- in this case C T I

7    would have.

8            THE COURT:  So what I hear you saying is you're

9    really suggesting to the Court, then, that you want to adopt

10   more of an interrelatedness test to characterize the degree of

11   overlap.

12           MR. SUDDATH:  I think that the issue is, Your Honor,

13   that the -- whether the damages are -- whether the damages that

14   they are seeking are damages that flow from the -- their

15   potential liability under the False Claims Act, as opposed to

16   being independent of any liability that they may face under the

17   False Claims Act.

18           And I think that, you know, one case that addresses

19   this issue is the Prabhu case out of the District of Nevada

20   where -- that was a case that we cited in our papers -- where

21   the -- there was a claim, third-party claim, brought by a --

22   somebody who had been named as the defendant in a False Claims

23   Act case, and in that case they brought -- the defendant

24   brought a third party claim against a party which it alleged

25   had participated in the fraud by assisting the defendant in

1   bringing -- in submitting false claims.

2            And in that case the district court allowed certain

3   claims to go forward as they get -- certain counterclaims

4   against the relator, those counterclaims, if I'm correct, were

5   counterclaims for libel and perhaps malicious prosecution but,

6   to the extent they were seeking to assert claims against a

7   third party for their alleged participation in the underlying

8   conduct, the court said those are not independent claims

9   because the effect of that, of allowing those claims to go

10  forward, would be in effect to give the defendant or the qui

11  tam defendant the ability to receive indemnification under the

12  False Claims Act; so what I would say, Your Honor, sufficient

13  to look at the effect of the claim and not how well it's pled,

14  not how well it's dressed up, because you can -- as the courts

15  have pointed out, through clever pleading a number of parties

16  have tried to escape the rule under Mortgages.

17            The other case, Your Honor, I would point out --

18            THE COURT:  Let me stop you before you move on.

19            MR. SUDDATH:  Certainly.

20            THE COURT:  It seems to me if you read Judge

21  George's -- Chief Judge George's ruling he starts with a

22  flat-out statement the qui tam defendants' claims include,

23  inter alia, breach of contract, breach of the covenant of good

24  faith and fair dealing, breach of fiduciary duty, fraud,

25  negligent misrepresentation.  Sounds familiar from somewhere.

1    Then he goes to say, in what really seems to be the linchpin to

2    this holding, each of the third party claims seeks to hold the

3    third party defendants liable to the extent that any false

4    claims are proven at trial.

5              And that seems to be the key to him to unlocking

6    this, and the question that I would ask C T I, if we follow

7    that line, is how is it that any of your claims found in the

8    complaint are not based on false claims that are proven at

9    trial?  And I want to make sure I understand that that's the

10   position that you're endorsing.

11             MR. SUDDATH:  Yes, Your Honor.  The position that we

12   are taking is that the -- that our liability in this case

13   arises out of our actions in -- our potential complicity, if

14   you will, in submitting the alleged false claims, and that the

15   damages that the defense -- that C T I is seeking to recover

16   from us are damages that are -- that -- all damages flow from

17   the -- their potential liability under the False Claims Act.

18             It's all tied together.  You can't -- it's not a

19   situation such as arises in some of these cases where it is an

20   independent claim for libel; it's an independent claim for

21   misappropriation of trade secrets.  For example, if a qui tam

22   relator were to have, during the course of their employment,

23   taken certain papers or had destroyed certain property, then in

24   that case, you know, the liability of the qui tam relator for

25   that claim is not in any way tied to any liability under the

1   False Claims Act.  It's completely separate.

2              THE COURT:  Let me stop you.  Pardon me for taking a

3   hatchet to your facts here, but I'm going to call C T I

4   basically a drug company and I'm going to refer to Lash

5   basically as a marketing expert.  Let's assume that there is a

6   distinction between Lash's efforts, some of which may be

7   covered by the False Claims Act, and Lash's efforts which were

8   negligent or just downright not very well done.

9              Are you telling me that they -- those kinds of

10  claims, the latter category, would also be barred?

11             MR. SUDDATH:  Yes, Your Honor, I am.

12             THE COURT:  Why?

13             MR. SUDDATH:  Because everything -- all those -- all

14  those claims, Your Honor, arise out of the same set of facts,

15  and the damages that they're seeking -- again you have to look

16  at -- you have to look at the -- the effect of allowing those

17  claims to go forward.  And if the effect of allowing those

18  claims to go forward is to allow C T I, the drug company, to

19  receive indemnification for any -- for any of their actions as

20  to which we may have participated as part of those actions

21  but -- it would allow them to receive indemnification under the

22  False Claims Act for -- if you will, under your scenario, for

23  actions that are -- they all arise out of the -- the same core

24  set of facts, which is the advice that we provided to C T I was

25  wrong, the advice that we provided to C T I caused them to

1   violate the False Claims Act.  Everything is tied together.

2           In your scenario you just can't divide, you can't

3   divorce the damages.  All the damages flow from the same set of

4   facts.

5           THE COURT:  Well, it seems to me that there -- I've

6   not worked my way through this.  This is a judgment on the

7   pleadings motion.

8           MR. SUDDATH:  Correct.

9           THE COURT:  If I have to get in and start examining

10  the facts and making factual determinations, then don't I get

11  flipped into a Rule 56 motion and then aren't they entitled to

12  the presumption that we're into the facts, that it would be

13  better to have a jury determine this?

14          MR. SUDDATH:  Oh, I -- well, I don't think you -- I

15  think the Court can make its determination based upon the

16  pleadings that are in the case at this point.

17          THE COURT:  Well, what do I do when I get to some of

18  their claims where you think their claim means one thing and

19  they think it means something else?  I mean doesn't that

20  require me to engage in a factual analysis?

21          MR. SUDDATH:  Such as what, Your Honor?

22          THE COURT:  At various points, you know, for breach

23  of terms of service in the service agreement.  That requires me

24  to then engage in an analysis of what was the scope of services

25  under the service agreement in order to draw this line of

1    violation.

2            I heard you use a phrase I haven't heard in a long

3    time, the operative core of central facts or whatever the old

4    standard used to be.  Are you saying that where you are is that

5    we've got this one set of activities, some of which may be --

6    contribute to false claims, some of which may not, but they are

7    so intertwined that the policy is I ought to reject any effort

8    to try and segregate those and find them all related to the

9    false claims?

10           MR. SUDDATH:  What I'm saying, Your Honor, is that if

11   you -- if the Court looks at the pleadings, looks at the

12   complaint, the Court can make a determination based upon the

13   record as it stands and that the record as it stands would -- I

14   think there is a basis for the Court to conclude that all the

15   damages as pled in the complaint are damages that arise out of

16   their -- arise out of the faulty advice that we allegedly gave,

17   which caused them to face liability under the False Claims Act,

18   whether those damages are damages for -- the direct damages or

19   business damages, because, but for our negligent advice,

20   according to Lash, but for that, they wouldn't have faced any

21   damages, and the advice is advice that -- again it goes back to

22   the advice that we provided, which allegedly caused them to

23   face exposure under the False Claims Act.

24           THE COURT:  I understand your argument.  Why don't

25   you go ahead and make any other points you want to make and

1    then we'll save you some time for rebuttal.

2              MR. SUDDATH:   Thank you, Your Honor.

3              I would -- Your Honor, I would just point out that

4    the -- in this case C T I has not cited any case allowing for

5    indemnification under the False Claims Act, that every court

6    that has addressed this issue has agreed there's no right to

7    indemnification under the False Claims Act, and the key again

8    is what is the effect of allowing that claim to go forward.  If

9    the -- if C T I were to prevail and if the effect of that is to

10   effectively provide for indemnification, then that claim is

11   barred under the False Claims Act.

12             And that stands also, Your Honor, no matter whether

13   it's a claim for negligence or there's a claim for breach of

14   express or implied warranty or express or implied contribution.

15   As we said in our papers, you know, the claim is whether it's

16   an express claim for indemnification, contractual claim for

17   indemnification, or implied claim for indemnification.  If the

18   effect is to allow for indemnification, then that claim is

19   barred.

20             The one case that -- the single case that they --

21   they cite which -- as enforcing a contractual indemnification

22   cause, if you will, in a False Claims Act case is the Watkins

23   case out of the District Court out of the District of Virginia,

24   and that was a case, Your Honor, where the courts didn't

25   address this issue.  The issue before that court was simply

1    whether or not to affirm an arbitrator's award.  And the court

2    decided it under contract principles.  In fact in that case,

3    Your Honor, the parties had agreed that the issue of the

4    potential liability under the False Claims Act would not be

5    before the arbitrator, that the issue before the arbitrator was

6    simply interpretation of contract law.

7           So, as the -- in this case, Your Honor, there has

8    been -- we found no case that would support C T I's position.

9    C T I has provided no case which would allow them to proceed in

10    this case for -- if the effect of any of their claims, no

11    matter how they're pled -- if the effect of that would be to

12    provide indemnification to them.

13           Thank you, Your Honor.

14           THE COURT:  Thank you, counsel.

15           Mr. Dunne, are you up?  All right.

16           MR. DUNNE:  Good morning, Your Honor.

17           Lash starts its argument with the Mortgages case, but

18    that case is simply an application of the False Claims Act, and

19    so you really need to start with a review of the language of

20    the False Claims Act.  And the first question that you have to

21    ask there, is there any language in that act that bars claims

22    by one defendant against another for independent rights under

23    contract of tort?  And clearly there's not, and our case that

24    we cited, Piqua, says that.

25           The next question, is there anything in the

1    legislative history that indicates that there is a

2    Congressional intent to do so?  Again there's nothing in the

3    legislative history.  The Mortgages case refers to the

4    legislative history of Congress's original intent of setting a

5    rogue to catch a rogue.  Well, that would protect qui tam

6    plaintiffs from retaliation, but it has nothing to do with

7    claims by one defendant against another defendant, and I'll

8    explain that a little more in a minute.

9         So, understanding that there is absolutely no support

10   in the False Claims Act to bar the claims that we have brought

11   in this case, then you have to take a look at what other law

12   might apply and what policies might apply.

13        THE COURT:  Well, isn't the linchpin to your argument

14   your use of the phrase independent right?

15        MR. DUNNE:  No.  It actually is not, because there's

16   no bar against contribution or indemnification.  The court

17   referred to the P S L R A, and the P S L R A there is a statute

18   that bars indemnification contribution claims against a

19   settling defendant.  We were the settling defendant.  Policy

20   there is to promote settlement.  It's clearly expressed.

21        And so that would be a very different application.

22   There you see a policy.  There is no policy that's stated in

23   the False Claims Act to protect an innocent settling or to

24   prevent an innocent settling defendant from recovering against

25   another defendant.

1          THE COURT:  What do you do with the language in

2    Mortgages where -- it's a per curiam opinion.  For the reasons

3    set out below we conclude there is no right of indemnity or

4    contribution among participants in the scheme to defraud the

5    government in the violation of the F C A.

6          MR. DUNNE:  You go back and you look at what the

7    court decided in the previous page before it made that

8    decision, and it did just two things.  It started by saying

9    Congress did not intend to create a claim or cause of action or

10   right of action for indemnification in the statutory scheme.

11   So it reviewed the statutory scheme and said, we don't find a

12   Congressional intent to create a right of one defendant against

13   another.  That doesn't mean that your preexisting contractual

14   rights are valid.

15          The second thing it does -- and this is what Judge

16   Coughenour decided in the Capital One case -- is that they

17   applied the Court v. Arb factors to see whether under federal

18   common law a defendant could imply a claim for contribution or

19   indemnification as part of the statutory scheme, applying the

20   various factors that Court v. Arb applied; and the court found

21   that it didn't.  That's all that's going on in Mortgages.

22          So it's looking at the implication, the existence or

23   implication of a right, not bar or prohibition against a

24   preexisting, separate right.  So we have an independent,

25   contractual, indemnification right, and we have independent

1    claim for professional duties from a professional that they

2    comply with their due care.

3              And the Court has focused on independent, so I'd like

4    to address some other issues, but let me first focus on your

5    questions about what is independent.

6              Not all --

7              THE COURT:  Excuse me.  Before you get to that one,

8    can you give me any case in which a court has permitted a

9    contractual indemnification right?  In this circumstance.

10             MR. DUNNE:  Yeah.  The case from the Eastern District

11   of Virginia.

12             THE COURT:  The Eastern District of Virginia, I mean

13   I've read that case, and what it says is we're affirming the

14   arbitration ruling.

15             MR. DUNNE:  Right.  But you would overturn an

16   arbitrator if an arbitrator completely refused to follow the

17   law; and if Mr. Suddath's argument is accepted that it would be

18   a complete refusal to follow the law, would be to allow such a

19   claim to proceed.

20             THE COURT:  I just heard him tell me that they didn't

21   even get to that question.

22             MR. DUNNE:  We have a different reading of the case,

23   because the case decision is the district court affirmed that

24   there was not a refusal to follow the law by allowing

25   indemnification because the contract did not exclude F C A

1    claims.  So I think there's not -- more importantly, there's no

2    case that has been cited by the defendant in which a court has

3    prohibited contractual indemnification claim, and I want to

4    talk about the difference between implied indemnification and

5    contractual indemnification, because I think that's central to

6    your question.

7              But let me before -- in case I may run out of time,

8    refer to the Court's decision in Madden, which says that there

9    are very serious due process concerns if a court willy-nilly

10   dismisses these kinds of claims just because they're against

11   various parties in a qui tam or False Claims Act case.

12             And here we've been adjudged of no wrongdoing; there

13   has been no finding of liability under the False Claims Act,

14   and I think there would be serious due process issues that

15   Madden recognizes, and Madden is subsequent to Mortgages.

16             If the court goes to page 4 of our brief, what we do

17   is we quote sections from the contract on which we rely, and

18   there are various duties that Documedics owed to us.

19   Documedics agreed in its contract that in performing its

20   services it shall meet generally-accepted performance standards

21   of similarly-situated, top tier, agent reimbursement companies;

22   so they agreed to a standard of performance.  They agreed to a

23   standard that all their staff would receive all necessary

24   training and possess all the licenses and permits to fully,

25   properly, adequately perform all services.

1           They also stated that their job as the reimbursement

2     expert is to insure that providers are as well-informed as

3     possible as to all patient choices.  They agreed to comply with

4     all applicable business conduct and regulatory guidance.  Those

5     are duties they owed to us directly.  We are not seeking to

6     imply from the False Claims Act and federal common law some

7     right that we don't have that isn't supported by either of

8     those applications.

9           Now, where is our right different from the implied

10    indemnification?  Well, a contractual indemnification right

11    doesn't just depend on liability under the False Claims Act.

12    And you hit the nail on the head, Your Honor, when you quoted

13    the presumption in Mortgages that the third party claimant

14    violated the False Claims Act.  So inherent in that decision is

15    a finding of a violation and a finding of wrongdoing.

16          Now, in their brief Lash calls us a wrongdoer over

17    and over and over.  That would require serious factual

18    findings.  That would require a trial.  We have not been

19    adjudged to be a wrongdoer in any sense of that word; so they

20    recognize that they really have no basis in fact to argue or

21    advocate for a policy that we cannot recover because we're a

22    wrongdoer, because there has been no finding that we're a

23    wrongdoer.

24          But, going back to this independent claim, our

25    indemnification --

1          THE COURT:  Counsel, is your position, then, that I

2    can draw no implication from the fact that you paid whatever it

3    was, 10.5 million dollars to settle a False Claims Act claim?

4          MR. DUNNE:  Just as with a D and O insurance policy

5    in a securities case, the settlement of the case allows you to

6    draw no implication that the settling defendants engaged in

7    intentional wrongdoing which would vitiate their ability to

8    recover under the D and O policy.  That also is an

9    indemnification contract, and the principles are relatively

10    similar there.

11          You could not under public policy be indemnified as a

12    securities defendant for intentional violations of the 33 act

13    or the 34 act.  But, as we know, settling defendants are

14    reimbursed 99.9 percent of the time, and Your Honor certainly

15    assisted that effort in the Chubb v. Nordstrom case.

16          So it's like a D and O insurance policy where there

17    are allegations of intentional wrongdoing, but in the absence

18    of an adjudication that does not vitiate your right to

19    insurance indemnification.  So that would be our position.

20          THE COURT:  Well, but in the false claims context,

21    let's assume you have a contractual indemnity provision, you

22    have two parties named in the False Claims Act provision, and

23    there is a settlement by one of them.  Your position, then,

24    would be that the presence of that contractual indemnity

25    provision would trump in effect the Mortgages holding that

1    there is not to be indemnity or contribution among defendants

2    in a False Claims Act.

3         MR. DUNNE:  The settlement doesn't trump it.  It

4    doesn't presume it either.  You can't presume that there is a

5    violation.  So in that action there must be proof of a

6    violation of the False Claims Act.  So you've merely shifted

7    the location where that proof would occur; so if we were

8    adjudged to have willfully and knowingly violated the False

9    Claims Act, then Mortgages would apply, to the extent it

10   applies to dependent claims.  It wouldn't apply to independent

11   claims but it would apply to dependent claims.

12        But there has to be that finding; otherwise there is

13   no due process; otherwise there's no basis on which to apply a

14   policy, because we're not a wrongdoer.  So that's our point.

15   The settlement, as Your Honor knows, admits no liability.  It

16   is a settlement of a risk, not of an act.

17        And our contention -- and this has to be accepted as

18   true for purposes of what we're doing here today -- is that the

19   basis upon which we had potential liability were the acts of

20   our agent sitting over here who sent letters to doctors or made

21   phone calls to doctors and said, you should be reimbursed for

22   all (unintelligible) uses who sent letters directly themselves

23   under their letterhead signed by him, telling Medicare carriers

24   you should reimburse for these off-label uses of Trisenox and

25   who themselves participated in appeals when Medicare carriers

 1    had denied.

 2            We're seeking contractual indemnification for their

 3    acts, not for our acts, and we would be liable (unintelligible)

 4    because they're our agent.  So that's a significant difference.

 5            Here's why the contractual indemnification claim is

 6    independent.  Documedics shall indemnify and hold C T I

 7    harmless against all liabilities.  Now, if our contract stopped

 8    there our claim would be completely dependent and we would be

 9    within Mortgages, because we would have to be found liable for

10    a False Claims Act violation to recover.  That's what the

11    common law indemnification requires.

12            All these cases, these district court cases -- and

13    there aren't any other Court of Appeals cases, but all these

14    district court cases that dismiss indemnification claims are

15    dismissing common law indemnification claims, and that only

16    arises upon a finding of liability.  That's different from our

17    contractual indemnification.  We don't have to be liable under

18    the False Claims Act to recover what the rest of that says,

19    which is losses, costs, and expenses and damages arising out of

20    or resulting from willful misconduct or negligent acts of

21    Documedics.  So that is an independent basis not dependent on a

22    finding of a False Claims Act violation.  The language you

23    refer to in Mortgages presumed an also violation of the False

24    Claims Act, so we are outside of the case there.

25            They also are required to indemnify us for breaches

1    of any covenants or agreements or from any violations that they

2    make of federal laws, and it's our allegation -- if the Court

3    wanted to see the testimony on this to support it we've got

4    it -- that they have had people who worked on this contract

5    testify that they sent letters to Medicare that

6    misrepresented -- they sent the letters and they misrepresented

7    whether Medicare should reimburse for off-label uses of our

8    drug.

9         So again their violations, not our violations, give

10   rise to the right here.  So to that extent we are outside of

11   Mortgages; we are independent.  There's another way that we are

12   completely independent, and Mr. Suddath didn't address this,

13   but our -- we have a completely separate damage claim that has

14   nothing at all to do with the False Claims Act and the False

15   Claims Act settlement.  It's disclosed in our initial -- our

16   supplement to our initial disclosures, and that's a motion

17   that's also pending before the Court, and it may help for us to

18   address that at the conclusion of this argument because I

19   think, now that discovery is closed, it's important to

20   understand what discovery was conducted on the damages.

21        But that damage claim would exist without any False

22   Claims Act proceedings whatsoever.  If a case had never been

23   filed, if there had never been a qui tam case, if there had

24   never been a settlement, that damage claim would exist.  And

25   here's what it is.  It says that we learned in late 2004 that

1    Trisenox was not entitled to be reimbursed for off-label uses

2    and this was a large part of our sales, a large part of our

3    market.

4          There are competitive drugs that entered the market

5    in May of 2003, May of 2004.  In two of our key off-label

6    indications, multiple myeloma and myelodysplastic syndrome.  We

7    had built business plans on future sales through 2012 in those

8    areas, and all of a sudden at the end of 2004, despite the

9    incorrect advice we had received that those diseases were

10   properly reimbursed, we learned that they were not properly

11   reimbursed.

12         The company disposed of the drug, made a decision to

13   divest itself of that drug within months because the entire

14   business assumption was vitiated and eliminated.  If we had

15   known that before, if we had never been misled into believing

16   that the drug was properly reimbursed, then in the normal

17   strategic planning the company would have made a decision to

18   divest early in 2004, and that would have occurred six months

19   earlier, and that would have saved 12 million dollars in

20   losses.

21         THE COURT:  Which of your five causes of action do

22   those damages allegedly arise from?

23         MR. DUNNE:  That arises both under the contractual

24   indemnification clause and from the negligent -- professional

25   negligence claim.  So, in other words, they acted negligently

1   in the performance of services and therefore are responsible

2   for losses and damages under that section.  And for

3   professional negligence in providing negligent advice to us on

4   which we reasonably relied in making corporate decisions, they

5   would be liable for those damages in that respect as well.

6          THE COURT:  Is that your third cause of action,

7   counsel?

8          MR. DUNNE:  I don't have the complaint in front of

9   me, but there --

10          THE COURT:  First cause of action is declaratory

11   relief.  Second cause of action is breach for service of the

12   terms of service in the service agreement.  Third cause of

13   action is breach of the service agreement's contractual

14   indemnification clause.

15          So I mean I'm trying to find out which it is that

16   you're proceeding under.

17          MR. DUNNE:  It is not the first.  It is the second

18   and the third.  And then there is a -- I don't know whether

19   it's the fourth or the fifth claim for professional negligence.

20          THE COURT:  Well, let me read you what your damages

21   are alleged under that.  It says, direct and proximate cause of

22   damage in the form of investigation, litigation, and settlement

23   expenses, including attorney's fees and costs.

24          I mean, doesn't sound to me like you've sought in

25   your complaint what you're now telling me you've got a cause of

1   action or damages for.

2              MR. DUNNE:  Well, we've sought all other and further

3   relief that is just and reasonable, and we've filed in -- on

4   April 21st a supplement to our initial disclosures which lays

5   out this damage claim and provides the calculations for the

6   damage claim.  Again that's subject to a motion to strike and

7   we could address that -- I don't know if you had intended that

8   we would today or not.  I'd be prepared to do that.

9              So what is the test?  The test, we would tell the

10  Court, is that a claim is dependent if the right of action

11  depends on a finding of a False Claims Act violation.  Our

12  contractual claim does not depend on a finding of a False

13  Claims Act violation, nor does the professional negligence

14  claim.  Certainly the (unintelligible) indemnification claim,

15  and this separate damage issue has absolutely nothing to do

16  with False Claims Act liability whatsoever.  It has to do with

17  decisions made in the course of strategic planning and when

18  those decisions would have been made if information had been

19  conveyed differently, nothing at all to do with the False

20  Claims Act.  So that under any of the tests that the courts

21  have looked at would clearly be independent.

22             THE COURT:  Let me go back, though.  It seems to

23  me -- isn't there a mutual indemnification clause?

24             MR. DUNNE:  No.  There are -- it's not a mutual

25  indemnification clause; it's a one-way indemnification clause

1    for the negligent acts of the consultant, services provided.

2            I might point out, Your Honor, this isn't in the

3    record because it happened recently, but Lash is a settling

4    defendant as well.  Lash has settled the qui tam action.  And

5    that case has now been dismissed, which is important because

6    one of the policies that you find in the courts, in the cases

7    that have been decided, that there be effective enforcement of

8    the False Claims Act and the government's ability to proceed

9    not be interfered with, so they will not allow counterclaims

10   and third party claims within the False Claims Act itself.

11   That's not an issue here, obviously.  This won't involve --

12   another policy is to protect plaintiffs and whistle blowers

13   from retaliation.

14            THE COURT:  I understand those arguments, counsel.

15   One moment, please.

16            Please proceed.

17            MR. DUNNE:  We touched on very briefly, Your Honor,

18   the problem that Lash has now because the facts they have

19   argued are not the facts that are alleged in the complaint.  I

20   would just point out that the allegations in the complaint are

21   that we did not violate the False Claims Act, which would

22   require us to have knowing conduct, and that has to be assumed.

23   To the extent that other facts need to be decided, as you said,

24   we would need a trial in order to do that.

25            So in the end this case boils down to a couple of

1    things.  One is are there any policies that are actually

2    promoted by the rule that Lash Group asks for here, because we

3    haven't been adjudged to be a wrongdoer, we haven't been

4    adjudged to be liable, we are not suing a qui tam plaintiff,

5    and we are not interfering with the government's prosecution of

6    a False Claims Act.  There are none of the policies that are

7    implicated here.  There's no statutory language that support

8    it, so there really is no basis to extend the Mortgages case to

9    this case, because none of the policies line up.

10            What is -- as we have argued, is far, far more

11   apparent is not to take a sledgehammer to this and use it

12   against every False Claims Act defendant, but in cases where

13   there has been no finding of False Claims Act liability to use

14   the tools of the common law, which have been pled in the answer

15   here, include in pari delicto defense and unclean hands

16   defense -- and those are more refined -- to address whether or

17   not my client should recover based on the facts as they are

18   found.

19            THE COURT:  Mr. Dunne, I used to despise when people

20   did this to me, and now it's my favorite thing to do.  Turning

21   to Article 8, indemnification, is there a difference between

22   8.1 indemnification by Documedics and 8.2 indemnification by

23   C T I?

24            MR. DUNNE:  I don't know, because 8.2 has not been

25   pled in this case, so no indemnification has been sought by The

1    Lash Group here.

2              THE COURT:  It seems to me, if I take your argument

3    and apply it, what I'm going to do at that point is basically

4    create a situation where you're going to be suing them for

5    indemnification, they're going to be suing you for

6    indemnification, and it seems to me I'm back to in effect

7    violating exactly the policy that my betters have told me I'm

8    supposed to protect here.

9              MR. DUNNE:  Which policy is that, Your Honor?

10              THE COURT:  To not allow indemnification for either

11    violations of the False Claims Act or arguably settlements of

12    the False Claims Act.

13              MR. DUNNE:  Well, I don't think you -- first of all,

14    we are not in that situation, so the only indemnification

15    claims are.

16              Secondly, until one is found to have violated the

17    False Claims Act you can't violate the policy by allowing

18    indemnification, so if we are innocent or merely negligent we

19    wouldn't have the standard to have been held culpable and

20    liable for violation of the False Claims Act.  Remember, we

21    settled a risk, and there's nothing -- there's nothing unusual

22    here, because this is merely a contractual indemnification

23    claim.

24              And these happen all the time, and people settle

25    risks, and then they go and they litigate over the

1    indemnification rights of the settlement of that risk, and

2    typically it has to do with the negligence or willfulness or

3    gross negligence of another party, depending on the contract.

4    But there's nothing that we are asking for here that is any

5    different than a normal contractual indemnification case.

6          And the tools are there to prevent indemnification if

7    we have been found to violate the False Claims Act.  And Lash

8    intends to put that case on as they have argued by making all

9    the factual allegations they did in their reply.  But they need

10   to put that case on and they need to prove it.  This is not an

11   appropriate decision to be made on a motion to dismiss.

12         THE COURT:  I'm going to ask you this one more time,

13   and perhaps you can summarize your answer.  What I hear you

14   telling me is that a claim for relief, based on damages in the

15   form of investigation, litigation, and settlement expenses,

16   including attorney's fees and costs, you think is not related

17   to the underlying False Claims Act and instead is a

18   free-standing contractual indemnity claim.

19         MR. DUNNE:  The free-standing contractual indemnity

20   claim that we have is the one that is disclosed in our

21   supplement to the initial disclosures, which isn't fairly

22   described by that allegation, so it is not specifically

23   described with particularity in the complaint.  I don't think

24   it needs to be under the law of the Ninth Circuit.  That issue

25   in itself hasn't been addressed to the Court.  It could be.

1          But the free-standing claim is a claim that in our

2      strategic decisionmaking the company would have divested itself

3      of the product six months earlier than it did and avoided 12

4      million dollars in losses.

5          THE COURT:  Counsel, have I ever seen the

6      supplemental disclosure?  Isn't that exchanged between the

7      parties?

8          MR. DUNNE:  I believe it's filed with the Court.

9      Yeah.  It's been -- it was filed -- if it hasn't been filed

10     with the Court, it was filed as an exhibit to Lash's motion to

11     strike the damages claim.  And I don't know if Your Honor would

12     like to hear argument on that, because I think there are

13     some -- a couple of things that would be worth saying about

14     that.

15         THE COURT:  Well, let's see if we get over this one

16     first.

17         MR. DUNNE:  Okay.  Thank you, Your Honor.

18         MR. SUDDATH:  Your Honor, the -- couple of points I'd

19     like to respond to.  This is -- this is not an ordinary

20     indemnification complaint.  This is a indemnification claim

21     that arises under the False Claims Act.  That under Mortgages

22     makes all the difference in this case.

23         And I think it's important, as the Court points out,

24     that you have to look at the complaint as alleged, not as

25     Mr. Dunne has argued, that what, you know, may have come out in

1    discovery, what they may hope to prove, what they may hope to

2    allege in a amended complaint, but in their complaint, as the

3    Court pointed out, their damages that they claim flow from the

4    causes of action as pled in the complaint are for the damages

5    arising out of the settlement of their complaint.

6          And I'll read from the complaint.  It says, Lash

7    Group's advice and conduct caused C T I to incur the cost of

8    investigating, defending, and settling claims by the government

9    that reimbursement was mistakenly made for use of Trisenox

10   off-label.  I don't think you could be any clearer that the

11   damages that they are seeking in this case are damages that

12   arise out of the fact that they were sued under the false

13   claims and they chose to settle that case.

14         Their due process argument, Your Honor, is -- I think

15   can be easily disposed of.  The Madden case, that talks about

16   due process in the -- where there's a compulsory counterclaim

17   that a defendant may need to bring against a relator.  If the

18   Court were to accept the due process argument in this case,

19   then effectively no court would be able to decide a motion to

20   dismiss.

21         They chose to settle this False Claims Act case.

22   They have received all the process to which they're due.

23         Mr. Dunne has made reference several times that

24   there's no finding of liability and therefore the court -- and

25   that makes a difference.  That doesn't make a difference under

1    the cases as decided.  Each -- many of the cases, Your Honor,

2    that we've cited have been cases that have arisen at either the

3    notion to dismiss stage or motion for judgment on the

4    pleadings.

5         One of the cases we cited was a heart doctor's case

6    which was a case directly on point where a defendant chose to

7    settle False Claims Act cases and then sought to bring an

8    indemnification claim against a third party.  The court said,

9    under Mortgages you can't proceed.

10         The -- you know, C T I has also argued that there's

11    no case that has barred a contractual enforcement claim for

12    indemnification of the False Claims Act case.  I would cite the

13    Court to the Hensel Phelps case in our papers, in which the

14    court made that conclusion, rejected a contractual

15    indemnification claim seeking indemnification under the False

16    Claims Act.

17         And then finally, Your Honor, I think it's -- you

18    know, if the Court -- again it's important to look at the case

19    as pled, not as they wish they had pled, not as they may seek

20    to plead, but I think it's important to look at what have they

21    pled in their complaint and what damages do they ask for.  And

22    the damages -- and I'll refer the Court to their initial

23    disclosure, which is what they filed back when this case

24    began -- and it says C T I's damages relating to its claims

25    are:  10.5 million dollars paid to settle the qui tam suit with

1   the government; half a million dollars, close to, $550,000 in

2   attorney's fees on the part of firms respectfully in defense

3   and settlement of the qui tam suit and related government

4   investigation.

5           The record as it stands now is just crystal clear

6   that the claims that they are seeking are claims and the

7   damages that they're seeking for those claims are damages that

8   arise out of the False Claims Act and arise out of the fact

9   that they chose to settle allegations against them made by the

10  U.S. Attorney's Office for their violation of the False Claims

11  Act.

12          We were not -- the government -- we were not a party

13  to that.  They were the party to it.  The government looked at

14  that, and they chose to bring the case against them.  C T I

15  chose to settle those, and it's as a result of their settlement

16  of those false claims allegations that we're here before the

17  Court.

18          And again I would -- the last point I would make,

19  Your Honor, is the -- we again have to go back to the

20  complaint.  We have to look at the complaint.  We have to look

21  at the allegations in the complaint.  They have dropped a

22  footnote saying, well, if the Court doesn't think there's

23  independent damages, then we can simply amend the complaint.

24  That in my view is an implicit recognition that as pled there

25  are serious problems with their complaint.  They haven't moved

1    to amend the complaint.  They're simply asking the Court --

2    they're saying that they may be able to do that.

3           In essence that's what they're attempting to do in

4    this supplemental disclosure.  I'll address that if the Court

5    wishes at the conclusion of this, because I think that there's

6    very substantial issues related to that.  But again what we

7    need to look at, Your Honor, is what is the current state of

8    the record of the pleadings that are before the Court.  And the

9    court has to look at that and it has to decide under Mortgages

10   whether or not the effect of allowing those claims to go

11   forward if prevailed upon would have the effect of allowing

12   them to receive indemnification for liability under the False

13   Claims Act.  That's what Mortgages stands for.

14          Thank you, Your Honor.

15          THE COURT:  Thank you, counsel.  The Court will take

16   this matter under submission.

17          Counsel, I'm going to say something that I usually

18   don't say.  My policy is is that we're here to try cases and we

19   do a lot of that, and I do not suggest settlement conferences

20   because I think that we're here as the ultimate arbitrator of

21   disputes and some disputes simply need to be tried.

22          In this one it strikes me that the ship of

23   indemnification and the ship of independent claims passed in

24   the night.  I don't know.  If I recall correctly, didn't you

25   all go see Judge Theiler at one point?

1          MR. DUNNE:  Yes, we did, Your Honor.

2          THE COURT:  All right.  You know, if you want to

3   renew those discussions, now you know a bit more about each

4   others' cases, I would urge you to do that with some dispatch,

5   because we're going to be issuing an opinion in this matter and

6   I suspect our opinion will simply give one side or the other a

7   feeling of greater confidence.

8          If you want to wait until that comes out and see and

9   then talk to the judge, that's certainly an option for you

10  also.  It strikes me that you now know a bit more about your

11  case and that might be an appropriate time for you to take a

12  look at that subject again.

13         Other than that, the matter is submitted.  Thank you,

14  counsel.  Nice to see all of you here.  It's nice to hear

15  well-done argument.

16         We'll be in recess.

17         MR. DUNNE:  Thank you, Your Honor.

18     (At 10:03 a.m. proceedings were adjourned.)

19                         --o0o--

20         I certify that the foregoing is a correct transcript

21  from the record of proceedings in the above-entitled matter.

22
                         \s\ Laurene Kelly
23
                    This 17th day of JUNE, 2008.